IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **GLENDA KATLYN KON STANDRIDGE,** ] | |
| ] | |
| Plaintiff, ] | |
| ] | |
| v.  ] | 2:23-cv-1021-ACA |
| ] | |
| **BLOUNT COUNTY BOARD OF EDUCATION,** ] | |
| ] | |
| Defendant. ] | |

## MEMORANDUM OPINION

After Plaintiff Glenda Katlyn Kon Standridge, a special education teacher with Defendant Blount County Board of Education, became pregnant, she applied for four different teaching positions with the Board. The Board did not offer her any of the positions but instead hired other candidates who did not yet have teaching certificates. Ms. Standridge alleges that the failure to hire her was pregnancy discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1).

The Board moves for summary judgment. (Doc. 9). The court **WILL GRANT IN PART** and **DENY IN PART** the motion. Because Ms. Standridge has not presented evidence of pregnancy discrimination with respect to the transitional kindergarten position at Cleveland Elementary School, the court **WILL GRANT**

the motion and **WILL ENTER SUMMARY JUDGMENT** in favor of the Board as to that position. But Ms. Standridge has presented enough evidence to create a factual dispute about the other three positions at issue in this case, so the court **WILL DENY** the motion as to those positions.

I.     **BACKGROUND**

When ruling on a motion for summary judgment, the court "view[s] the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve[s] all reasonable doubts about the facts in favor of the non-movant." *Washington v. Howard*, 25 F.4th 891, 897 (11th Cir. 2022) (quotation marks omitted). Where the parties have presented evidence creating a dispute of fact, the court's description of the facts adopts the version most favorable to the non-movant. *See id.*; *see also Cantu v. City of Dothan*, 974 F.3d 1217, 1222 (11th Cir. 2020) ("The 'facts' at the summary judgment stage are not necessarily the true, historical facts; they may not even be what a jury at trial would, or will, determine to be the facts.").

The Board hired Ms. Standridge in 2018 as a special education collaborative teacher. (Doc. 10-2 at 62). When it initially hired Ms. Standridge, she lacked an Alabama teacher's certificate but had an interim certificate. (*Id.* at 10). The State gave her a teacher's certificate in March 2020. (*Id.* at 163). She also held a bachelor's

degree in liberal arts, a master's degree in collaborative education, and a certification in early childhood education. (*Id.* at 6).

By 2022, Ms. Standridge was tenured and teaching eighth, ninth, and tenth grade students at the Blount County Learning Center. (Doc. 10-4 at 11; doc. 10-2 at 168). Students at the Learning Center are enrolled at other public schools but receive special education services at the Learning Center. (Doc. 10-4 at 11). Also by 2022, Ms. Standridge had four children and had gone through two pregnancies while employed at the Learning Center. (*See* doc. 10-2 at 66, 79).

In May 2022, Ms. Standridge began applying for positions at other schools. (*Id.* at 14). The Board requires teachers to have a four-year education degree and a valid Alabama teacher's certificate. (Doc. 10-4 at 128; doc. 10-7 at 10). However, the Board considers candidates eligible for hire even before they receive their certificate as long as they are eligible to receive it. (Doc. 10-7 at 12). If the Board hires a candidate who is eligible for certification but has not yet received a certificate, the Board will help the candidate to apply for an interim education certificate (if enrolled in a master's program) or a provisional certificate (if taking certain classes and taking a test called the Praxis). (*Id.* at 7). Getting one of those provisional certificates takes three to nine months. (Doc. 10-8 at 8). Board policy states that "[o]ther things being equal, the Superintendent will give preference to the candidate who has procured the more advanced [degree] or experience." (Doc. 10-4 at 128; *see*

3

doc. 10-7 at 10–11). The Superintendent has advised principals and directors, who make recommendations about who to hire, that they can also consider interviews. (Doc. 10-11 ¶ 3).

Between May and July 2022, Ms. Standridge applied for various positions, including the four positions at issue in this case. (*See* doc. 10-4 at 135; doc. 10-2 at 23; *see also* doc. 16 at 5 n.1). Marlana Matthews, the principal of Cleveland Elementary School (doc. 10-3 at 5), interviewed Ms. Standridge twice (doc. 10-2 at 14). Ms. Standridge's first interview with Ms. Matthews—for a position not at issue in this case—went poorly because a parent had confronted Ms. Standridge that morning about his belief that she had abused his child, "rattl[ing]" her. (*Id.* at 14–16; doc. 10-3 at 34). Ms. Standridge told Ms. Matthews that she loved the children but "struggle[d]" with the adults and found working entirely in a self-contained classroom "very mentally taxing." (Doc. 10-2 at 15). She also explained that staying at the Learning Center would not help her gain experience for advancement. (*Id.* at 15–16).

Several weeks later, Ms. Matthews invited Ms. Standridge to interview for a position teaching transitional kindergarten. (*Id.* at 16–17). Transitional kindergarten was a pilot program put on by Cleveland Elementary School under which special education students and typical students shared a classroom with the intention of transitioning the special education students into regular classes. (Doc. 10-7 at 15, 17;

4

*see also* doc. 10-2 at 17; doc. 10-4 at 16). The program did not require the teacher to hold a special education certificate. (Doc. 10-7 at 15–17).

Before the interview, Ms. Standridge's son, a student at Cleveland Elementary School, revealed to Ms. Matthews that Ms. Standridge was pregnant. (Doc. 10-2 at 18). Ms. Matthews told Ms. Standridge, "Oh, my gosh, you are going to have your hands full." (*Id.* at 18). Ms. Matthews continued to make frequent comments about how many children Ms. Standridge was going to have, particularly as Ms. Standridge's pregnancy became more visible. (*Id.* at 24).

Ms. Matthews testified that the second interview also did not go very well. (Doc. 10-3 at 34). She felt Ms. Standridge "was more interested in leaving [the Learning Center] than trying to come [to Cleveland Elementary School]—her interview came across as her trying to get out of where she was versus trying to be in our school." (*Id.* at 21). Ms. Matthews conceded that she did not write that impression down in her interview notes, though she did write down that Ms. Standridge had "used the word stuck with 7th, 8th, and 9th grade." (*Id.* at 21–22).

Ms. Matthews recommended Emilee Nelson for the transitional kindergarten position. (*Id.* at 22). Ms. Nelson had graduated with a bachelor's degree and was planning to enroll in a master's program but did not have either a general education certificate or a special education certificate by the time of the interview. (Doc. 10-3

5

at 24–26). She received her early childhood education certificate in June 2022 (before the school year began) and an interim certificate in special education in March 2023 (after the school year had begun). (*Id.* at 24, 92). Ms. Matthews testified that she recommended Ms. Nelson for the position because she had a strong interview, completed her residency at Cleveland Elementary School and then worked as a substitute teacher for a first grade classroom there for the rest of the school year, had experience working at a pre-K center, had a son with autism, and expressed a desire to continue her education in special education. (*Id.* at 29). The Board approved Ms. Matthews's recommendation. (Doc. 10-11 at 6).

The Learning Center also has a transitional program called "Crosswalks." (Doc. 10-4 at 16). One of the jobs Ms. Standridge applied for was a K-3 and K-4 Crosswalks position. (*Id.* at 41). The director of the Learning Center, Steven Love, conducted the interviews for this position. (*See id.* at 72). By this time, he knew that Ms. Standridge was pregnant. (Doc. 10-2 at 40; doc. 10-4 at 35). Mr. Love—who had also sat in on the interviews for the Cleveland positions—testified that he felt Ms. Standridge had made clear in her interview that she did not want to stay at the Learning Center and "was looking for any and every opportunity to leave." (Doc. 10-4 at 35; *see also id.* at 45, 54). Mr. Love agreed, however, that his interview notes do not reflect Ms. Standridge explicitly saying she wanted to leave the Learning Center. (*Id.* at 46).

6

Mr. Love recommended Ashley Seals for the Crosswalks position. (*Id.* at 21). Ms. Seals had a Virginia teaching certificate but no Alabama teaching certificate. (*Id.* at 33–34, 37). Mr. Love testified that he recommended her because he was impressed by her interview, she had great references, and she wanted to be at the Learning Center. (Doc. 10-4 at 35). The Board offered Ms. Seals the position in June 2022. (*Id.* at 136). She received her Alabama teacher's certificate in October 2022, after the start of the school year. (*Id.* at 140).

During Ms. Standridge's fourth and fifth pregnancies, Mr. Love made comments like, "well, you know what causes [pregnancy,] don't you?" (Doc. 10-2 at 27). He also asked if her family had cable, from which Ms. Standridge inferred that he meant "if you don't have cable, all you do is have sex." (*Id.* at 27). And he made comments about five kids being a lot of kids. (*Id.* at 38–39). When Ms. Standridge asked what she could do better to get a different position, Mr. Love told her that she was so good at her position that finding a replacement would be difficult. (*Id.* at 41). He explained: "It is so much easier to fill a position here than it is over there," which Ms. Standridge believed referred to Cleveland Elementary School. (Doc. 10-2 at 41).

Ms. Standridge also applied for a position at Locust Fork Elementary School. (*See id.* at 23; doc. 11 at 18 ¶ 35; doc. 16 at 8 (not disputing ¶ 35)). Amy Williamson is the principal of that school. (Doc. 10-6 at 4). Ms. Williamson and Ms. Standridge

7

attended the same church and both served in the choir, though Ms. Williamson knew her by her nickname of "Katy" instead of her legal name of "Glenda." (*Id.* at 7–9). When the choir director asked Ms. Williamson to interview Ms. Standridge for a position at Locust Fork Elementary School, she looked at the list of applicants and thought Ms. Standridge had not applied because she did not see a "Katy Standridge" on the list. (*Id.* at 9, 21). Ms. Williamson testified she never looked at Ms. Standridge's application before this lawsuit was filed. (*Id.* at 19).

Ms. Williamson recommended Amy Love for the position. (Doc. 10-6 at 10). Ms. Love had worked at Locust Fork for two years as an instructional aide, then completed her student teaching there. (*Id.* at 10). When Ms. Williamson recommended her for the position, Ms. Love had finished her coursework for a bachelor's degree in elementary education but had not yet received her degree or a teacher's certificate. (*Id.* at 13–14). The Board accepted Ms. Williamson's recommendation and offered Ms. Love the position. (*Id.* at 92–93, 97). Ms. Love received her degree in December 2022 and her teacher's certificate in April 2023. (Doc. 10-6 at 14; *id.* at 65).

In July 2022, Ms. Standridge applied for a position as a kindergarten teacher at Cleveland Elementary School. (Doc. 1 ¶ 24; doc. 5 ¶ 24; doc. 10-2 at 30). Because of Ms. Standridge's two previous interviews, Ms. Matthews decided not to invite her to interview for that position. (Doc. 1 ¶ 25; doc. 5 ¶ 25; doc. 10-3 at 34).

Ms. Matthews recommended Sydney Bailey for the position. (Doc. 10-3 at 152). Ms. Bailey had a bachelor's degree in psychology and was enrolled in a master's program due to conclude the following year, but she did not have any teacher certifications. (*Id.* at 34, 37). Ms. Matthews attested that she selected Ms. Bailey because she seemed like she would work well with younger children and she had experience as a camp counselor and a substitute teacher for kindergarten and first grade. (Doc. 10-1 at 5 ¶ 10). The Board accepted the recommendation. (*See* doc. 11 at 8 ¶ 12; doc. 16 at 6–7 (not disputing ¶ 12)). Ms. Bailey received an interim employment certificate in March 2023. (Doc. 10-3 at 117).

Ms. Standridge attests that Ms. Nelson, Ms. Seals, Ms. Love, and Ms. Bailey were not pregnant when the Board hired them or during the 2022–2023 school year. (Doc. 15-1 ¶¶ 1–4). The Board objects to the affidavit on hearsay grounds but does not dispute that the hired candidates were not pregnant at the time, nor does the Board make any argument that Ms. Standridge's claim fails because other candidates were pregnant. (Doc. 17 at 6). Thus, for purposes of this motion, the court will accept this fact as undisputed.

## II.    DISCUSSION

Ms. Standridge alleges that the Board discriminated against her based on her pregnancy, in violation of Title VII, by failing to promote her into the four positions

9

discussed above. (Doc. 1 ¶¶ 1, 33–37). The Board moves for summary judgment on the ground that Ms. Standridge cannot prove discrimination. (Doc. 11 at 21).

Title VII prohibits covered employers from "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). The term "because of sex" includes "because of or on the basis of pregnancy." *Id.* § 2000e(k). A plaintiff may prevail on a Title VII claim in several ways, including by presenting circumstantial evidence satisfying the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803–04 (1973) or by demonstrating a "convincing mosaic of circumstantial evidence that warrants an inference of intentional discrimination." *Lewis v. City of Union City*, 918 F.3d 1213, 1220 & n.6 (11th Cir. 2019) (en banc). Ms. Standridge contends that she can satisfy those two tests using circumstantial evidence. (*See generally* doc. 16).

Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc). In pregnancy discrimination cases, the plaintiff may do so by presenting evidence that (1) she belongs to a protected group; (2) she was qualified for the position she sought; (3) she suffered an adverse employment action; and (4) the employer treated similarly situated employees outside the protected class differently. *DuChateau v. Camp, Dresser & McKee, Inc.*,

10

713 F.3d 1298, 1302 (11th Cir. 2013); *Holland v. Gee*, 677 F.3d 1047, 1055 (11th Cir. 2012). If the plaintiff carries that burden, the "employer must articulate a legitimate, nondiscriminatory reason for the challenged employment action." *Chapman*, 229 F.3d at 1024. If the defendant does so, the plaintiff must present evidence from which a jury could find that the proffered reasons were pretextual. *Id.* at 1024–25. Establishing that a reason is pretextual requires the plaintiff to show "*both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993); *see also Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1163 (11th Cir. 2006).

The Board contends that Ms. Standridge cannot make out a *prima facie* case of discrimination because for three of the positions, the interviewers concluded that another candidate was equally or more qualified. (Doc. 11 at 25–28, 31–33). This argument fails because the second element of the *prima facie* case does not ask whether the selected candidate was more qualified than the plaintiff but instead whether the plaintiff was qualified for the position. *See DuChateau*, 713 F.3d at 1302; *see also Walker v. Mortham*, 158 F.3d 1177, 1193 (11th Cir. 1998) ("Although a plaintiff may be forced to address relative qualifications if the defendant presents them to rebut the plaintiff's presumption of discrimination, the plaintiff need not introduce evidence regarding relative qualifications before then; she need only prove that she herself was qualified to perform the coveted job.").

The Board also contends that Ms. Standridge cannot establish her *prima facie* case with respect to the Locust Fork position because Ms. Williamson did not know that Ms. Standridge had applied. (Doc. 11 at 34). But the Eleventh Circuit's formulation of the *prima facie* case does not require Ms. Standridge to establish that the interviewer knew of the plaintiff's application. She need only establish that she is a member of a protected group, she was qualified for the position, she was not hired, and she was treated differently than similarly situated employees outside her protected class. *See DuChateau*, 713 F.3d at 1302; *Holland*, 677 F.3d at 1055. The court declines to find that Ms. Standridge failed to make out a *prima facie* case based on a requirement that the Eleventh Circuit has never set forth.

Because the Board's only arguments with respect to the *prima facie* case are unpersuasive, it "must articulate a legitimate, nondiscriminatory reason for the challenged employment action." *Chapman*, 229 F.3d at 1024. The Board asserts that for three of the positions, the interviewers who made hiring recommendations believed that the selected candidates were better qualified, and for one of the positions, the interviewer did not know Ms. Standridge had applied. (Doc. 11 at 25–27, 31–34). Because the Board presents evidence from each of the interviewers consistent with those reasons (*see* doc. 10-3 at 21, 29, 34; doc. 10-4 at 35; doc. 10-6 at 9, 21), it has carried its burden, *see Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981) ("The defendant need not persuade the court that it was actually

motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.") (citation omitted). As a result, to survive under the *McDonnell Douglas* framework, Ms. Standridge must present evidence from which a reasonable jury could find that those reasons are pretextual. *See Chapman*, 229 F.3d at 1024–25.

"[T]o establish pretext at the summary judgment stage, a plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1136 (11th Cir. 2020) (en banc) (quotation marks omitted). Ms. Standridge contends that she can show pretext because she presented evidence that the selected candidates were not qualified for the positions at all, the interviewers violated Board policy by failing to give preference to the candidate with the more advanced degree and more experience, Ms. Matthews and Mr. Love lacked any written notes from the interviews substantiating their testimony that they recommended candidates who had better interviews, Mr. Love made comments indicating that he felt it would be easier to find a substitute for Ms. Standridge if she remained at the Learning Center, and a jury could disbelieve Ms. Love's assertion that she did not know Ms. Standridge had applied. (Doc. 16 at 28–38).

Not all of Ms. Standridge's arguments are persuasive. In particular, the court rejects her arguments that the Board was *required* to recommend her because she had a more advanced degree and more experience and that the lack of contemporaneous notes from Ms. Matthews and Mr. Love rebuts their testimony about their interview impressions. (*See id.* at 33–35). But Ms. Standridge has presented sufficient evidence to require a jury to determine whether the Board's reasons for three of its hiring decisions were pretextual.

The court begins with the transitional kindergarten position at Cleveland Elementary School. Ms. Standridge argues that the selected candidate, Ms. Nelson, was unqualified for the position because she lacked a special education certificate until March 20, 2023. (*Id.* at 29). However, the undisputed evidence is that the transitional kindergarten position did not require a special education certificate. (Doc. 10-7 at 15–17). And Ms. Nelson received the required certificate—an early childhood certificate—in June 2022, before the school year began. (Doc. 10-3 at 92). Ms. Standridge has not presented evidence from which a jury could find that Ms. Nelson lacked the required qualifications.

The Board presents evidence that Ms. Matthews selected Ms. Nelson because she had a better interview, had worked at Cleveland Elementary School before, had a child with special needs and had worked at a pre-K center, and was continuing her education in special education. (*Id.* at 29). By contrast, Ms. Matthews felt that

14

Ms. Standridge's interview went badly and that Ms. Standridge wanted to leave the Learning Center more than she wanted to work at Cleveland Elementary School. (*Id.* at 21, 34). Ms. Matthews's interview notes do not contradict her testimony about her impression of Ms. Standridge's interview. (*See id.* at 18–20). And "a subjective reason for an employer's action—such as poor interview performance—can be as legitimate as any other reason." *Bass v. Bd. of Cnty. Comm'rs, Orange Cnty.*, 256 F.3d 1095, 1105 (11th Cir. 2001).

Accordingly, no reasonable jury could find pretext based on "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Ms. Matthews's proffered reasons for selecting Ms. Nelson over Ms. Standridge. *Gogel*, 967 F.3d at 1136. Because Ms. Standridge relies on the same evidence to support her convincing mosaic of circumstantial evidence (doc. 16 at 38–39), this claim also cannot survive under that test. The court **WILL GRANT** the motion for summary judgment as to Ms. Standridge's failure-to-hire claim about the transitional kindergarten position at Cleveland Elementary School.

The other three positions are different. Taking the disputed facts in Ms. Standridge's favor, all three of the interviewers knew that Ms. Standridge was pregnant when she applied for those positions. (Doc.10-2 at 18, 40; doc. 10-6 at 7). And although Ms. Williamson testified that she did not know Ms. Standridge had applied, there is evidence that a mutual friend notified Ms. Williamson of

15

Ms. Standridge's application. (Doc. 10-6 at 9, 21). Based on this evidence and the fact that "Standridge" is not a very common name, a jury could reject Ms. Williamson's explanation that she did not realize "Glenda Standridge," who had applied for the position, was the same person as "Katy Standridge." (*See id.* at 7–9).

Moreover, the Board hired three candidates who lacked the required certifications over Ms. Standridge, who had the required certifications. (Doc. 10-2 at 6; doc. 10-3 at 117; doc. 10-4 at 140; doc. 10-6 at 14, 65). This was in violation of the Board's written policy that "[a] candidate seeking employment . . . must have . . . a valid Alabama teacher's certificate." (Doc. 10-4 at 128). Although the Board presents evidence that it routinely hires candidates who lack that qualification as long as they are eligible to receive a certificate (doc. 10-7 at 12), it is still a violation of the written policy. *See Alexander v. Fulton Cnty.*, 207 F.3d 1303, 1340 (11th Cir. 2000), *overruled in other part by Manders v. Lee*, 338 F.3d 1304, 1328 n.52 (11th Cir. 2003) (en banc) ("[B]oth the Supreme Court and [the Eleventh Circuit] have observed that evidence showing an employer hired a less qualified applicant over the plaintiff may be probative of whether the employer's proffered reason for not promoting plaintiff was pretextual."); *see also Bass*, 256 F.3d at 1108 ("[T]he fact that the [employer] promoted . . . an employee who was unqualified under the [employer]'s criteria[ ] over [the plaintiff] supports an inference of discrimination."). And despite the Board's assertion that Ms. Standridge also lacked

16

a teacher's certificate when it hired her (doc. 11 at 6 ¶ 4), she had an interim certificate when hired (doc. 10-2 at 10).

The Board presents evidence that Ms. Matthews and Mr. Love found the other candidates to be a better fit for their schools in light of their belief that Ms. Standridge wanted to leave the Learning Center more than she wanted to work in the positions for which she had applied. (Doc. 10-1 at 5 ¶ 10; doc. 10-3 at 29, doc. 10-4 at 35). As stated above, "a subjective reason for an employer's action—such as poor interview performance—can be as legitimate as any other reason." *Bass*, 256 F.3d at 1105. But for these positions, Ms. Standridge's evidence that the candidates were not qualified under the written hiring policy suffices to create a dispute of material fact that a jury must resolve. The court **WILL DENY** the motion for summary judgment with respect to Ms. Standridge's failure-to-hire claim about the Crosswalks position, the Locust Fork position, and the kindergarten position at Cleveland Elementary School.

### III. CONCLUSION

The court **WILL GRANT IN PART** and **WILL DENY IN PART** the Board's motion for summary judgment. The court **WILL GRANT** the motion as to Ms. Standridge's claim that the Board discriminated against her by failing to hire her for the transitional kindergarten position at Cleveland Elementary School. The court **WILL DENY** the motion as to Ms. Standridge's claim that the Board

discriminated against her by failing to hire her for the Crosswalks position, the Locust Fork position, and the kindergarten position at Cleveland Elementary School.

**DONE** and **ORDERED** this February 24, 2025.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE